Your first case, Pepsi, Thompson, you're up, counsel. My name is Tom Crosby. I represent Pepsi MidAmerica. In these consolidated actions, 10L57 and 10TH98, just by way of formatting, I know the court has read the briefs, but there were three law actions brought against former employees of Pepsi alleging violation of their non-competes and tortious interference by dynamic vending to solicit the violation that were consolidated for trial in the circuit court. Summary judgment was granted in favor of the defendants. All of the defendants in those cases and sanctions were later awarded approximately a year after summary judgment was granted. That case has been consolidated with the Chantry case against Bart Mullinax, the former manager of the Pepsi vending operation. In that case, there were multiple counts. Summary judgment was entered on one of the counts, count four, which was the only count that named dynamic vending and Mullinax. The other counts have not been decided. There was a motion for summary judgment filed, but it was never heard. There was a special finding on this to take it up. In regards to the L cases, we're here on appeal challenging the sanctions, the 137 sanctions, but not looking at the motion for summary judgment for the reason basically the passage of time and the type of employment that those defendants had. I think that the cases, both the L case and the Chantry case, arise out of the same facts and transactions. We challenge the granting of the summary judgment in favor of dynamic and Mullinax in the Chantry case. The basis for that challenge is that there are material facts precluding the entry of summary judgment. The gravamen of count four was that dynamic vending encouraged and elicited a breach of the non-competent from Mullinax, and then Mullinax gave confidential information, which enabled dynamic vending to take over some of the major Pepsi accounts in the Mount Vernon area. Is that just here in the county here? Excuse me? They just had the stores here in this county here? It was centrally located in Mount Vernon, but both the Pepsi and later the dynamic vending served stores and plants. Like Marin or Carmel? Basically, Centralia South, and with most of the vending operations being located in the Mount Vernon area. The accounts that were at issue in this case weren't vending accounts at the servicing machines at a Huck's store or general public. Basically, machines, vending, and commissary machines within plants. National Rail, the Walgreens, NASCO, where you have the same population of workers using the same machines, and therefore their habits, the placement of the products, the products that are used, the sales data that Pepsi had, is all relevant to the ability of dynamic to both service those and to solicit their business. It's important to note here that in this type of vending area, the people who service the machines, the sales people and the managers, the customers follow them. When Pepsi moved into the vending in Mount Vernon, they purchased a company called J&J Vending. Mullinetz worked for J&J Vending. He worked for the predecessor of J&J Vending. He serviced these accounts that Dynamic Vending later took from Pepsi for a period of years. He had personal relationships with all of the purchasing agents and everyone in those facilities. Because of that, when Pepsi hired him and his support staff, the defendants in the L cases, they did so in order to maintain a long-term control over those vending accounts. They paid him $88,000 a year to stay there and help cement those accounts with Pepsi. Things started to go wrong with the relationship between Pepsi and Mullinetz in the summer of 2010. Mullinetz, who had always been located here, he's in Woodlawn, and he's always had his family here in Mount Vernon, was told that he would be transferred to Marion. At about that time in July of 2010, a new manager came on for this area above Mullinetz, Mr. House. Mr. House immediately detected that something was amiss here, that he wasn't getting the same information from Mullinetz that he was from other support staff about what was going on in the vending. Particularly, there was the Walgreens account, which was a major hub here and a major financial account for Pepsi, that Mullinetz had a long-time relationship with the woman, Mary Suppley, who led the contracts there. On July 13, 2010, Mr. House came on board on July 12. He immediately started to review the accounts. He wants to review the Walgreens account. He talks to Mullinetz. Mullinetz says, everything's fine there. He then has Mullinetz and another employee go to Walgreens and do a walkthrough, talk to their main people, talk to Suppley. Everything's fine. July 20, there's a communication between Suppley, the Walgreens, and Mullinetz saying that the account is leaving, that they're giving the 60-day notice under the contract, and they're going to transition to Dynamic Vending on September 17. On that day, Mullinetz has three conversations with Mr. Koretz, the president of Dynamic Vending. After having two conversations with Mary Suppley and receiving a subsequent email from her, he has conversations with the president of the competitor. He doesn't call Pepsi for two days. Doesn't call. So is that evidence of – circumstantial evidence that there's something amiss here and that Mullinetz is cooperating, at least in July of 2010, with Dynamic Vending? I would say yes, and I would say that in a motion for summary judgment, all facts, of course, are going to be drawn in favor of the non-movement. We have evidence after that time, in late August, there was another account, National Rail, where one of the defendants, Mr. Herman, in the L case was working, and they – to make sure that that account was going to be serviced, House and another employee went there with Mullinetz on August 31st, asked for time to approve their service. They were given 20 days. On that day of that meeting, which was crucial to Pepsi retaining that business, Mullinetz calls Koretz three times. Why? Oh, he says we were talking about fishing and golf. Beer. Beer, yeah, beer was one of the ones. Koretz says they're fishermen, not golfers. He wanted to get Mullinetz to talk Italian. Anyway, so we have these communications, but we have more direct evidence that there was a violation. We know that through the admissions of Mullinetz that he started to identify, both before and after his departure from Pepsi – well, let's talk about his departure from Pepsi. Walgreens changing over on September 18th. They change over from Pepsi to Dynamic. Vending machines are being exchanged. Mullinetz is there. The next working day, without any notice, he retires and immediately starts working for Dynamic Vending. But now he didn't start in this area, did he? Well, he did. Oh, he did? He did, because we had an admission from Mr. Koretz who contacted Mr. Vellani, who was the attorney below, when he knew that – Vellani's office informed Dynamic Vending they were going to bring an injunctive action. Koretz calls back that afternoon and talks to Vellani and says, I know about the non-competing. I plan on having Mullinetz work in southern Illinois and pay him $500, which is liquidated damages. There were two non-competes. He didn't know about the second management non-compete that provided for damages above that. But it certainly shows his intent to hire Mullinetz, in other words, to work in southern Illinois. We have a sighting of Mullinetz after he goes to work for Dynamic at a Good Samaritan hospital in Centralia in a Dynamic Vending outfit. That is a Pepsi account. We have an admission by Mullinetz that he contacted the head of the vending at the Holiday Inn here in Mount Vernon to inform him that he was no longer with Pepsi, that he was disappointed with Pepsi, and that he was with Dynamic Vending. It was that admission that Judge Neubauer dismissed as being just a contact, a touching base, letting him know what he's doing. You know, interpreting all of the facts in favor of the movement there. There's other facts. Mullinetz admits that he contacted Herman or pointed Herman out, one of the defendants in the L cases, who took care of some of these accounts that were taken over by Dynamic Vending, to Koritz. Koritz hires him. When Herman leaves, he gives a false reason where he's going. He adds to Steve Sheohorn. Sheohorn says he's going to fast food. Hughes, who was servicing NASCO, says she's going to operate a nail salon. They immediately go and work for Dynamic Vending. Before the time they leave Pepsi and go to Dynamic Vending, we have at least eight phone calls from Mullinetz to them that we know happened after Mullinetz left. So the non-compete for Mullinetz talks about both direct and indirect competition. So it doesn't matter that he's not actually selling in southern Illinois. He can't indirectly aid their operations in southern Illinois, which he certainly does by identifying key employees that then leave. I would like to reserve a couple minutes, but I think that the record is fairly replete that there are material questions of fact that preclude summary judgment. And I think that both Judge Overstreet and Judge Neubauer were somewhat confused by the suggestions of the defendants that there were admissions that Pepsi had no actual knowledge of these anti-competitive violations. And I've gone through that in my brief by showing that during his deposition, Mr. House was asked questions and required to only answer on his personal knowledge. He talks about these phone conversations that he knows about. And, you know, the counsel for Dynamic Vending says, what did he say? I don't know. He wasn't on the phone conversations. So from the I don't know what was said, this has been convoluted into an admission that we have no evidence. In an affidavit for support of summary judgment, Mr. Koretz, whose deposition wasn't taken, was scheduled and he wasn't available, although he was able to sit in on the deposition of Mr. Mullinetz on the same day, he files an affidavit and he has all these facts that we got. For example, we got the Walgreens account on July 13th, the day the Pepsi walkthrough, where everything was fine. And he also says, I first contacted Mullinetz on July 20th, which is the first phone date we have, phone record we have. Let's not say he didn't contact him in none of the ways. And we already had that account, so he didn't give me any confidential information. All of the facts that are the allegations in the, in the, are virements in the affidavit, counsel for Dynamic Vending convinced the trial court, these are admitted. Nothing was admitted. This is their view of an opposite side of material facts. Here's one. Hughes, the defendant in one of the L cases, tells another Pepsi vending employee, Davids, to call Mr. Koretz, which she does. Koretz offers her a job in exchange for getting confidential information as to what's going on at General Dynamics and what's going on at Walgreens. She refuses to give any information other than the number of vending machines. This happens in August of 2010, while Dynamic has not yet gotten Mullinetz. But from that, we can infer that when Koretz contacts these other employees, he's offering the same deal, a job for information. Why isn't that a reasonable employment? I'd like to, if I could, move on to the 137, because I think that the facts are replete and it's hard to juggle four cases. The 137 requires detailed findings of fact. We don't have those here. We have an order that says there was an inadequate pretrial investigation and no evidence to support at the time of summary judgment or at the time of filing. That is not adequate. In the Erland case, which is cited on page 20 of my brief, the following order was found to be insufficient. Quote, plaintiffs did not make an adequate and sufficient investigation into the facts prior to filing the complaint in this manner. B, the discovery matters and the answers to requests to admit show there was no basis for the litigation to be brought. C, the requirements of Illinois Supreme Court Rule 137 were not met in this case. End quote. Sanctions entered. Insufficient as a matter of law because the 137 requires strict compliance. It's a punitive statute. You have to say in what manner the pre-filing investigation was inadequate. What's the test there? The test is a what, given the circumstances at the time of the filing, would a reasonable person have taken the same actions that the alleged filer did? What did PEPC know? It knew that at the time of filing, that Mullinex had left his employment, immediately went to dynamic vending, and had a call from Korres, the president of the company, who said that he knew about the non-competitive, didn't care if he was going to have more consumers. That enough should be enough. That alone should be enough. It also knew that Mullinex had identified other employees, key employees, and that they had, under false pretenses and with excuses, gone immediately to work, left PEPC and went immediately to work for dynamic vending, working then in the same accounts that they serviced not only for PEPC but its predecessor, J&J Vending. The vending accounts follow the people. Now, would it be reasonable to think that there was a violation of the non-compete? Yes. Well, they had more. They had Doris, who said in August of 2010 she was contacted by the president of dynamic vending and offered a job in exchange for confidential information. Then, prior to dynamic vending being served, they got the phone records, and they found from those phone records all these communications between Mullinex and Korres while Mullinex was an employee of PEPC. The test is not whether or not a plaintiff has all the evidence it needs to prove the material facts. The test is whether or not the plaintiff is lying or he is acting reasonably given the totality of the circumstances. Given the totality of the circumstances, the assumption of PEPC that there had been a violation of its non-compete was not only reasonable, it's convincing. If there's no questions, I'll save the rest of the time for the public. Thank you. Counsel. Please sit forward. Good morning. This is an unusual case in that, unlike any I've dealt with in my career, where when you look at the complaints that were filed here, you see an incident of basically admitting the person who signed them, the affidavit, admitting that they had no evidence that these things were true. I'll give you an example. Mr. House, who signed the complaint and who signed the affidavit, said in his allegations under oath that Mullinex worked in Southern Illinois. When I asked him about that, do you have any evidence he ever worked in Southern Illinois, he said, no, I don't have any evidence that that's true. And, in fact, PEPC never brought any evidence that that's true. One of the things you need to be very aware of, Your Honors, is that a lot of the things PEPC's talking about here in terms of evidence, they brought up after the summary judgment motion, not at the time. For example, the Holiday Inn incident. The Holiday Inn incident is Mullinex talking to a friend of his at the Holiday Inn, talking about law, and talking about maybe getting a job at the Holiday Inn and getting out of the vending business. There is no evidence that he was even talking about the business of dynamic vending. But, moreover, they didn't even bring that up until much later. If they had such evidence, the trial judge deserved to hear that at the time of the summary judgment and not be criticized for his decision by evidence they're trying to bring up later. Let's take Bridget Davitz is her name. She worked for National Railroad. That was not brought up at the time of summary judgment, but brought up much later by way of some affidavit. But what we see in that is, Josh Hortz is talking to Ms. Davitz about Walgreens, but keep in mind, at the time he's talking to her about Walgreens, he already has that account. Walgreens has decided to come and work for him or work with him and not use Pepsi. Let's talk about Walgreens for a minute. In fact, there are six customers that Pepsi says dynamic vending stole from. All six of those customers, actually, let me back up. Five of those customers decided to go with dynamic vending before the first time Josh Hortz and Bart Malonex ever talked to each other. Every one of them said, all of those five said, we are going to switch from Pepsi and go with dynamic vending before there was any communication with Bart Malonex, and Pepsi knew that at the time they filed their complaint. They knew when that happened. Walgreens is a good example. We know from affidavits in the file that Walgreens was very upset with Pepsi. They had Mr. House and all the Pepsi bigwigs up there to talk to him about, we are very upset about our service. They lost that account due to poor service, and Brian House admitted it. He admitted that all the other accounts were lost due to poor service. In fact, NASCO, which they lost, was lost after a taste test. They got dynamic vending in there. Pepsi, they had a blind taste test with their customers and with their employees, and the employees said, we prefer dynamic vending. That's how they lost that account. And the sixth one was lost after the communication with Malonex, but Mr. House admitted, we lost that account due to poor service. In fact, he said they lost every account due to poor service, and there was no evidence that any confidential information was transferred from one to the other. Let's go back to working in southern Illinois. There's no evidence of that, none were presented, but they said they had a sign in Good Sam that he was there in his uniform. That wasn't brought up to the trial judge. Then they say, and that's pretty much all they have, are these three things that happened afterwards, and so when the trial court was properly looked at, what did they know at the time of the filing and looked at House's admissions? He says, he's the one that signed it. He said, I don't have any evidence. He worked in southern Illinois. I don't have any evidence. He shared any confidential information, and in fact, we lost these accounts due to poor service. But that's what the trial judge was faced with, trying to find was there any evidence presented by Pepsi that would indicate they had any information that would show that their allegations were true, and they had none. They had more opportunities to do that, and they didn't take them. This argument that they didn't get to depose Josh Kortz, or they didn't get to complete discovery, when we had those motions for several judgment hearings, Pepsi never asked to delay them to complete any further discovery, take anybody's deposition. They just came and presented their arguments, and then later, after they had lost them, they came and they wanted to bring in other evidence. In fact, what they tried to do in the case of the three employees was, in fact, just tell the judge, just take judicial notice of all the facts we have over in this case. Well, that's not appropriate. We had two different judges. This case is unusual in that we actually had three judges, and every judge who looked at what Pepsi was doing here found they didn't have any evidence to support these very specific allegations made under oath at the time they made them. One of the things I thought I heard, and I may be wrong, what Mr. Crosby said was that in the Herman, the three employees case, the Herman case we'll call it, that they're not appealing the summary judgment in that case. In the brief, I saw that they had raised that issue of whether or not they could, whether that was appropriate or not, but if I heard Mr. Crosby correctly, I think they are not appealing the summary judgment in that case, and just the sanctions, and I think that's appropriate because those three employees should never have had an uncompleted agreement with the court probably found it. These are folks that fill vending machines, empty the coins out, replenish the machines. That's what they do. And one guy was just fixing the machines, and here Pepsi is trying to prevent them from working. I will tell you this about Judge Forrest. He did speak with Mr. Malani, and that was brought up again after the mission for summary judgment was over, brought up later, and what Mr. Forrest said was, look, I'll pay the $500 a month for Malanax to work in Southern Illinois. Well, they didn't do that. He didn't pay the $500, and he honored Pepsi's agreement by keeping Malanax in Missouri and never let him work in Southern Illinois a day, not one day. So what do they point at? They point at, well, Mr. Malanax told Mr. Herman that there was a job opening at Dynamic Avenue. What's wrong with that? That's not illegal to do that. He didn't have to go work for them, but he checked into it and did it. Hughie, her name is pronounced Hughie and not Hughes, but Hughie just stayed where she was. She was working for NASCO. She had worked for the vending company before Pepsi. She worked for Pepsi. She just stayed at NASCO, and her job was to fill the vending machines and do coins. That's what she did. So here we have a question of sanctions. I think clearly when you look at the timeline and facts, what really happened here, you see that the summary judgment was clearly appropriate on Malanax. There just wasn't any evidence to support it and certainly not any evidence brought up to the trial judge at the time of the summary judgment, and even the judge who reviewed it agreed as well. And so here we get to this question of sanctions, and again, this has been rare in my career to see this, even at school. But in this case, because of the complete lack of evidence to really support it that was presented to the court, the court almost had to award sanctions because of the omissions of Pepsi. And here we have a person who not only signed a complaint under oath, but signed an affidavit under oath to allegations that he says he could not prove and didn't have evidence at the time. You know, Pepsi makes a lot of grief about the fact, well, the judge applied the wrong test. He was looking at what they had later, the evidence they had later, and not looking at the evidence they had at the time of the trial. Actually, the judge, all judges, all three judges, looked at both times, and what they said was, look, Pepsi, based on what you've shown us, it's clear to us that at the time you filed this suit, you didn't have any evidence that any of this was true, and you still don't at the time of summary judgment. You still don't have it. I understand sometimes people file suits, and they base it on certain information, and then by the time they get to summary judgment, maybe they have more information. In this case, that's not true. They didn't have it when they started. They didn't have it at the time of summary judgment. And so, you know, after criticizing the trial court for not just looking at the time of the filing for the facts, after criticizing the court for that, Pepsi launches into this, let's look at all this other evidence that we acquired much later and didn't even present to the court at the time of summary judgment, second-guessing the court, and so on. So I guess the bottom line here is, is there evidence that any of these customers were lost because of confidential information that was shared? There is no evidence that that ever happened. Were they lost before even communications between these people? Yes, they were, except for one, and that event was lost due to poor service. In fact, Pepsi had a real problem with poor service, as you can see from all these sick customers leaving them, which they admit was for that reason. Did Mellon X work in Southern Illinois? Well, they brought up a couple of incidents where he talked to a guy at the Holiday Inn, not about dynamic vending. He showed up at Good Samaritan Hospital in a uniform. They had no idea what he was doing there. If he talked to anybody, there's nothing to support that. And all these things, they're trying to piece together into some argument that, well, we didn't really have direct evidence of it, but we sort of had some circumstantial evidence. Well, here's the problem. When you take all that circumstantial evidence and add it up, it doesn't add up to anything. You know, I have a problem with if they lost the count because of poor service, then why did they hire the people that served them? Does that make any sense? They hired the people that did poor service, allegedly. Well, you need to understand that with respect to those three people, one of them was just fixing machines. One of them was working at NASCO filling machines, but that NASCO account was lost due to the poor food. Taste test, okay. Yeah, the taste test. They said, we like the taste of this food better than this food. It wasn't the result of Ms. Hubie not doing a good job. And Mr. Sheehorn just drove and chucked around and put the stuff in the machine. Yeah, but that's the service, isn't it? Well, that's part of the service, but that wasn't really the problem there. In fact, he didn't even service all of those accounts. Other people did as well. And the real problem with Pepsi had to do more with the product, being able to get the things that people wanted and those sorts of things, more than that. And so if the problem was that Mr. Sheehorn would have been the only one doing the servicing, but if the problem was that Mr. Sheehorn was the service, Pepsi would have been glad to see them go. Instead, they're upset that he's going. The problem with Pepsi, as we see from Mr. House's testimony, was that just overall their whole operation was not good at servicing vending customers. I think they're very good at buying Pepsi and distributing that out, but they got into this vending business, and they're in a competition with other people who do vending, and they weren't providing as good a product. Nasco is a good example. You know, Walgreens was upset with them with their service long before, and had them in for a big meeting, long before quarters ever showed up. Finally said, we've had it, and we're not going to use you anymore. And they solicited, you'll see in the evidence, they actually solicited Dynamic Vending. They went to Dynamic Vending, and Nasco solicited Dynamic Vending. This isn't a case where Mr. Mullinax is sharing any confidential information with these folks. What happened here happened before Mullinax really ever started talking to them. And so, you know, the standard for sanctions, the review of sanctions, is abuse of discretion. Was it reasonable for these trial judges, all three of them who reviewed this matter, to conclude that sanctions were appropriate? Again, it's an unusual case, but they all agreed on the same thing. Pepsi had no evidence at all. What we really see, Your Honors, is in this case, we see a company, Pepsi, who puts these non-competes on all their employees, even employees that they now admit here today that should not have had a non-compete, to control these folks. And, you know, our law in this state is contrary. We're for work and allowing people to move, not industrial servitude. That's what they were trying to impose on these three employees who were filling machines and working on machines and just going about their daily job. Now, Mullinax is a different thing. He was in sales, and that's a little different. But in that case, there's no indication he ever worked in Southern Illinois. In fact, Dynamic Bidding honored the agreement he had and kept him out of Southern Illinois the whole time. They never had any evidence at the beginning nor at the end. For all those reasons, Your Honors, we ask that the decisions of the trial court, in both cases, be affirmed and honored. If there are no other questions, I appreciate your time. Thank you. Thank you, counsel. I didn't know that I made an admission that the non-competes for the three law cases were inappropriate. If I did, I don't recall that, and I certainly don't believe that. Admissions come quickly to Dynamic Bidding. But let's talk about what the judges said. They said that we didn't have credible evidence at the time we filed the complaint or at the time of the motion for summary judgment. Now, yes, when these cases are reversed, we're not going to proceed with prosecution of the three individuals in the L cases. But we did bring up in the brief that the summary judgment was improperly granted because there was material questions of fact. Why? Because Judge Overstreet relied on the findings of the summary judgment as supporting the 137 sanctions. The issue here is not whether there was evidence at the time of filing. There is no burden of production on a plaintiff at the time he files to have adduced evidence. The 137 sanctions are imposed on plaintiffs who file, or any party who files a pleading, knowing it is false. That's why the test is, would a reasonable person, given those circumstances, have acted in the same way? Answer, yes. Dynamic Vending had convinced the trial court that there was no credible evidence regarding the allegations in either complaint. In order to do that, the trial court had to weigh the credibility of Mr. Koretz against the circumstantial evidence presented by Pepsi. That is not the role of a trial judge in a motion for summary judgment. In Judge Overstreet's order and Judge Neubauer's orders, which were written by the Dynamic Vending attorney, but certainly the court's orders, they both state, they both use the term credible evidence. They are weighing the evidence. That is not the role of the court. That is the role of the trier of fact. Mr. Cox has given you the presentation of the view of the world by Mr. Koretz. That is not the view of the world that will be presented at trial. There is a basis for proceeding to trial on the circumstantial evidence alone, and we don't need circumstantial evidence if we look at the admission of Mr. Koretz that when he hired Mullinex, he was planning to violate, deliberately violate, the non-compete. Now, the whole, you know, causation, they already lost these accounts. Why? Because Mr. Koretz sent his affidavit they had. And they didn't, Pepsi didn't bring up the Mullinex holiday in the summary judgment, but we did. And we point that out in brief, that Judge Neubauer was given the deposition of Mr. Mullinex, where that admission is in. He said he would consider it in his order. He said he considered the depositions of the parties. It was in the Mullinex deposition. It certainly was brought to his attention in the motion for reconsideration. Now, both the, Richard Davis was presented both in summary judgment and in the motion for consideration, but that doesn't matter to this court. The law is that regardless of whether or not the party brought it up, if it's in the record, this court would consider it. We are sanctioned, the trial judge has sanctioned Pepsi for doing something that is reasonable. Based on the presumption that when Pepsi brought this action, it should have been able to immediately produce all the proof it was going to have it brought. And because it didn't have credible evidence in the words of the trial judges at the time it filed, it therefore is subject to sanctions. That cannot be the law of no one.  Thanks, fellas, this morning. Okay. Case is not until 10 o'clock back here at 15 minutes.